IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MARGREATHA HEIN and VOLGA
GERMAN RESEARCH, LLC,

          Plaintiffs,

v.                                        Case No. 24-01126-JWB

BRENT MAI,

          Defendant.

**MEMORANDUM AND ORDER**

This matter is before the court on Defendant's motion for summary judgment and Defendant's motion to exclude expert testimony. (Docs. 53, 65.) The motions are fully briefed and ripe for decision. (Docs. 54, 60, 65, 66, 69, 72.) Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART for the reasons stated herein. Defendant's motion to exclude expert testimony is also GRANTED IN PART and DENIED IN PART.

## I. Facts and Procedural History

The Volga German people are individuals of German origin who moved to the Volga region of Russia in the eighteenth century. *Volga German History*, NORTH DAKOTA STATE UNIV. (last visited Sept. 26, 2025), https://library.ndsu.edu/grhc/research-history/germans-russia/volga-german-history. Many of the descendants of the Volga German people have moved to other parts of the world after persecution of Germans in Russia. *Id.* There is a sizable Volga German diaspora in the American Midwest. *Id.* Plaintiff Margreatha Hein and Defendant Dr. Brent Mai are both genealogy researchers on the Volga German people. (Doc. 54 at 3-4; Doc. 60 at 3.) Their research is the subject of this lawsuit.

1

Plaintiff Hein is the sole owner of Plaintiff Volga German Research LLC ("VGR"), under which she operates a website, www.volgagermans.org, where she publishes her research on the Volga German people. (Doc. 60 at 12-13; Doc. 66 at 4-5.) Defendant concedes that Plaintiff VGR owns the website operated by Ms. Hein. (Doc. 66 at 5.) Dr. Mai is the Dean of Libraries at Wichita State University, has held similar positions with other universities, and operates his own website, www.volgagermaninstitute.org, where he publishes his research. (Pretrial Order, Doc. 59 ("PTO") at 2-3.) In November 2020, Ms. Hein wrote a letter to Dr. Mai "complaining of Mai's copying her research" and posting it to his website. (*Id.* at 3.) Three years after her letter to Dr. Mai, Ms. Hein wrote again to Dr. Mai's employers and complained of copyright infringement and plagiarism on Dr. Mai's website. (*Id.*) In the same month, Ms. Hein registered eight photographs with the U.S. Copyright Office. (*Id.*) These photographs were taken by Ms. Hein in Europe and Dr. Mai republished them on his website as early as 2017. (*Id.* at 4.) Ms. Hein also claims ten copyright registrations, each covering multiple textual compilations of her research. (PTO at 6.) Ms. Hein contends that Dr. Mai has copied 107 textual compilations from her website. (*Id.*) These textual compilations are paragraph form summaries of genealogical information, organized by last name. (Doc. 60 at 5-6.) The parties dispute exactly what materials Ms. Hein used to formulate these compilations. (Doc. 60 at 6.) The parties have fought over a particular sample of their work: their respective entries for the German name "Hessler", which appears on both websites. (Doc. 54 at 16; Doc. 60 at 22.) Ms. Hein's expert witness claims that Dr. Mai's copying on this entry is largely

representative of his alleged infringement of her other compilations.  (Doc. 60-4 at 18.)[1]  The court

reproduces the text Ms. Hein registered for copyright below:

> Johann Jacob Hessler (son of Johann Jacob Hessler of Niedergründau) was baptized on 15 December 1718.    Anna Maria Meininger (daughter of Johannes Meininger of Mittelgründau) was baptized on 2 December 1725. Johann Jacob and Anna Maria married in Rothenbergen on 26 August 1745.
>
> Baptisms were recorded for the following children, all born in Rothenbergen: Johann Conrad, born 5 February and baptized 12 February 1747 (died 30 April 1754); twin daughters born 28 May and baptized 29 May 1751, Anna Margaretha (died 16 May 1754) and Christina; Anna Margaretha born 22 May and baptized 25 May 1755; Elisabetha, born 24 January and baptized 26 January 1760 (died 27 Jan 1760); and twin sons born 5 February and baptized 7 Feb 1762, Valentin (died 5 Mar 1764) and Friedrich.
>
> Jacob Hessler died on 8 Nov 1762. On 5 Jan 1764, Anna Maria Hessler (widow of Jacob Hessler) married Hartmann Ifland (son of Johannes Ifland from Lützelhausen) in Rothenbergen. They had a daughter Catharina, born 2 January and baptized 8 January 1765.
>
> Hartmann, Anna Maria, and three of the Hessler children (Christina, Anna Margaretha, and Friedrich) arrived in Russia on 9 August 1766.  Hartmann apparently died during the journey to the villages.

(Doc. 60-4 at 20.)

Dr. Mai admits that he posted research from Ms. Hein's website on his website and listed

her as a contributor or a researcher.  (Doc. 54 at 5-6.)  All of Dr. Mai's and Ms. Hein's research

on their respective websites is freely accessible to the public and neither party receives any income

directly from the disputed material on their website.  (Doc. 54 at 6-7; Doc. 60 at 7-9.)  Dr. Mai

does, on occasion, receive income from leading tours of the Volga region or translating certain

---

[1] The court chooses the Hessler entry because the parties have referred to it extensively in their briefs.  (Doc. 54 at 16; Doc. 60 at 22.)  The parties have not produced all 107 claimed infringements to the court.  As explained in the "Copyright Infringement" section, the court has reviewed the other additional examples submitted with the parties' expert testimony briefing.  (Doc. 69-4 at 9-38.)  Because Plaintiff's expert witness claims that "Hessler" is representative of the broader set of infringements, and the additional examples reviewed by the court appear that way, the court treats the "Hessler" example as representative.  Plaintiff, who has the burden to produce facts to defeat a motion for summary judgment, has not provided any additional examples that vary in a significant way from Hessler.

documents.  (Doc. 54 at 6; Doc. 60 at 16.)  Ms. Hein has stated she has no interest in similar business.  (Doc. 60 at 9.)

On July 23, 2024, Plaintiffs filed the instant lawsuit against Defendant seeking monetary damages, declaratory and injunctive relief for harms arising out of Dr. Mai's copying and republishing of information on Plaintiffs' website.  (Doc. 1 at 16-17.)  Plaintiffs allege that Dr. Mai has violated the Copyright Act at 17 U.S.C. §§ 102-03 by infringing upon copyrighted photographs and compilations of genealogy research.  (PTO at 12, 13.)  Plaintiffs also raise a claim for false endorsement under the Lanham Act as codified at 15 U.S.C. § 1125 arising out of Dr. Mai's listing of Ms. Hein as a "researcher" or "contributor" on his website.   (*Id.* at 13-14.)  Dr. Mai allegedly did this over 300 times (Doc. 60 at 14) but not necessarily every time he used Ms. Hein's research.  (*Id.* at 7.)  Finally, Plaintiffs raise common law unfair competition claims.  (PTO at 14.)  Plaintiff VGR is only pursuing claims for unfair competition.  (*Id.* at 12.)

Before the court is Defendant's motion for summary judgment (Doc. 53), where he argues that Plaintiffs lack standing.  (Doc. 54 at 9-12.)  In the alternative, Defendant argues that Plaintiff's compilations are not copyrightable, his use of Ms. Hein's work is protected by the fair use doctrine, that the false endorsement and unfair competition claims fail as a matter of law, and that some of the claims are barred by the statute of limitations and damages provisions. (*Id.* at 12-24, 27-30.) Defendant also claims that Plaintiff VGR has no interest in any of the claims and is therefore not a proper party to the action.  (*Id.* at 24-27.)  Plaintiffs contest each of these justifications for summary judgment.  (Doc. 60.)  To address the motion, the court will consider the facts outlined above as well as others raised by the parties in the course of their arguments.

But the court first addresses Defendant's motion to exclude testimony of Plaintiffs' expert, Dr. Kenneth Crews.  (Doc. 65.)  Dr. Mai seeks to exclude Dr. Crews' testimony for several reasons

including: (1) that Dr. Crews does not have the necessary genealogy experience to qualify as an expert; (2) that Dr. Crews' testimony fails all of the *Daubert* factors; (3) Dr. Crews' testimony offers improper legal conclusions and legal interpretations and thus intrudes on the province of the court and the jury; and (4) that part of Dr. Crews' testimony was not timely disclosed. As explained below, the court agrees in part with Defendant and excludes some of Dr. Crews' expert opinion on the grounds that it is improper analysis reserved for the court and jury.

## II.    Standard

### A.    Summary Judgment

Summary judgment is appropriate if the moving parties demonstrate that there is no genuine dispute as to any material fact and the movants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Haynes v. Level 3 Commc'ns*, 456 F.3d 1215, 1219 (10th Cir. 2006). The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

In considering a motion for summary judgment, the facts set forth in the motion must refer "with particularity to those portions of the record upon which" the moving party relies. D. Kan. R. 56.1(a). "All material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." *Id.* To properly dispute a proposed statement of material fact, the opposing party must "refer with particularity to those portions of the record upon which the opposing party relies." D. Kan. R. 56.1(b)(1). Failure to properly controvert a proposed fact that is properly supported will result in a determination that the fact is admitted. *Coleman v. Blue Cross Blue Shield of*

*Kansas, Inc.*, 287 F. App'x 631, 635 (10th Cir. 2008) (finding that the "district court was correct to admit all facts asserted in Blue Cross's summary judgment motion that are not controverted by a readily identifiable portion of the record.") (internal quotation and citation omitted).

### B.    Expert Testimony

Generally, district courts have broad discretion to determine whether a proposed expert may testify. *United States v. Nichols*, 169 F.3d 1255, 1265 (10th Cir. 1999). Federal Rule of Evidence 702, which controls the admission of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of expert testimony bears the burden of showing the expert testimony is admissible. *Hampton v. Utah Dep't of Corr.*, 87 F.4th 1183, 1201 (10th Cir. 2023). "First, the Court determines whether the expert is qualified by knowledge, skill, experience, training or education to render the opinion." *Lippe v. Howard*, 287 F. Supp. 3d 1271, 1277-78 (W.D. Okla. 2018). After determining an expert is qualified, "the district court must satisfy itself that the testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony." *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1282 (10th Cir. 2018) (quoting *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc)). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (citation omitted). However, "rejection of expert testimony is the exception rather than the rule." *United States v. Mansker*, No. 23-CR-342-JFH, 2023 WL 8234645, at *2 (N.D. Okla. Nov. 28, 2023).

"The court has discretion to determine how to perform its gatekeeping function under *Daubert*." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ, 2020 WL 1164869, at *3 (D. Kan. Mar. 10, 2020) (citing *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019)).  The most common method of fulfilling that role is by conducting a *Daubert* hearing, "although such a process is not specifically mandated." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000).  The district court may satisfy its gatekeeping role without a formal *Daubert* hearing "so long as the court has sufficient evidence to perform 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* (quoting *Daubert*, 509 U.S. at 597).

## III.    Expert Testimony Analysis

Plaintiffs submit expert opinion testimony from Dr. Kenneth Crews, a law professor and expert in copyright law and library science.  (Doc. 69 at 1.)  As explained above, Defendant seeks to exclude Dr. Crews' opinions on multiple grounds.  (Doc. 65. at 1.)  The court grants in part and denies in part Defendant's motion to exclude because portions of Dr. Crews' opinions intrude into the exclusive realms of the judge and jury.

Dr. Crews provides an expert report and declaration to explain his opinions in this case.  (Docs. 69-2 and 69-3.)  Dr. Crews' report contends that Ms. Hein's photographs and textual compilations are the proper subject of copyright and have been infringed upon by Dr. Mai.  (Doc. 69-2 at 17.)  His report compares Dr. Mai's reproductions of Ms. Hein's textual compilations to the originals.  (*Id.* at 20.)  Dr. Crews also opines that Plaintiffs have had their Lanham Act and unfair competition rights violated by Dr. Mai's listing of Ms. Hein as a "researcher" or "contributor."  (*Id.* at 27-29.)  Dr. Crews also provides background on the Copyright Act, the

process of registering copyrights, and the remedies that are available to injured holders of copyrighted material.  (*Id.* at 9-15.)  Finally, Dr. Crews provided a supplemental declaration expressing his opinion that none of Dr. Mai's usage of Ms. Hein's work is protected by the defense of "fair use."  (Doc. 69-3 at 4-7.)

Defendant first argues to exclude Dr. Crews because he is not trained as a genealogist and therefore does not have the expertise necessary for him to testify in this matter.  (Doc. 65 at 4.) But the issues that Dr. Crews opines on are not really about the practice of genealogy and are instead more about copyright infringement, which Dr. Crews is most certainly qualified to opine on.  *See* (Doc. 69-1.)  While merely possessing a degree is not sufficient to open the courthouse doors to any expert testimony within that profession, *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969-70 (10th Cir. 2001), Dr. Crews is not merely the holder of a law degree opining on a specialty like copyright.  Rather, as his extensive CV demonstrates, Dr. Crews has substantial professional expertise in copyright law.  (Doc. 69-1.)  Dr. Crews has been a scholar of intellectual property law since at least 2000.  (*Id.* at 2.)  Dr. Crews possesses a PhD in Library and Information Science; he published his dissertation on copyright law and policy.  (*Id.* at 3.)  He has published five books on copyright and a great number of other publications.  (*Id.* at 4-9.)  Copyright law is what Dr. Crews seeks to testify about, not the specifics of genealogy research, which are not at issue in this case.

Defendant's next contention that Dr. Crews's testimony "fails all of the *Daubert* factors" seems to be primarily based on an objection to testimony that contains legal conclusions.  *See* (Doc. 65 at 6-7.)  Accordingly, this argument is resolved by the analysis below which addresses Defendant's objection to Dr. Crews offering legal analysis.  (*Id.* at 7-10.)

Rule 704 makes clear that experts are not prohibited from testifying on "ultimate issues." Fed. R. Evid. 704. The Tenth Circuit has applied this rule in a way that divides ultimate factual issues from ultimate legal issues. *See Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988) ("While testimony on ultimate facts is authorized under Rule 704, the committee's comments emphasize that testimony on ultimate questions of law is not favored."). The logic for the Tenth Circuit rule harmonizes well with the intention of expert testimony. "The basis for the distinction is that testimony on ultimate factual questions aids the jury in reaching a verdict; testimony which articulates and applies the relevant law, however, circumvents the jury's decision-making function by telling it how to decide the case." *Id.*; *see also* Fed. R. Evid. 702(a). Testimony "directing a verdict, rather than assisting the jury's understanding and weighing of the evidence" must be excluded. *Specht*, 853 F.2d at 808.

Still, the Tenth Circuit rule is not iron clad. "A witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible." *Id.* at 809. The court recognizes that a witness may be necessary to help the jury understand "facts in evidence . . . [that are] couched in legal terms." *Id.* The Tenth Circuit found that the line between permissible and impermissible testimony is found where the expert does not "discours[e] broadly over the entire range of applicable law." *Id.* The relevant question for this court is whether Dr. Crews' opinions will instead "focus[] on a specific question of *fact*." *Id.* (emphasis added). "Permissible testimony provides the jury with the tools to evaluate an expert's ultimate conclusion and focuses on questions of fact that are amenable to the scientific, technical, or other specialized knowledge within the expert's field." *United States v. Richter*, 796 F.3d 1173, 1195 (10th Cir. 2015) (citing *United States v. Dazey*, 403 F.3d 1147, 1171-72 (10th Cir. 2005)).

The court grants Defendant's motion here because it finds that, as expressed in Dr. Crews' report, much of Dr. Crews' opinion crosses the line into the province of the judge and jury. At the very beginning of the report Dr. Crews informs the reader that his work will "follow the basic structure of a copyright infringement case." (Doc. 69-2 at 9.) His report's methodology is apparently just the three elements of copyright infringement. (*Id.*) It is hard to see how this is not "discoursing broadly over the entire range of applicable law." *Specht*, 853 F.3d at 809. Moreover, at various points in the report Dr. Crews announces the following conclusions:

> (1) "This report will demonstrate that this case involves the basic ingredients of a straightforward infringement action, and that the evidence supports Ms. Hein's assertions that the defendant violated her legal rights as a copyright owner" (Doc. 69-2 at 11);
> (2) "[I]t is my opinion that, without seeing further evidence that satisfies the rigors of the law, I cannot conclude that any of the works are 'works made for hire'" (*Id.* at 13);
> (3) "This report will demonstrate that the works in question meet the eligibility requirements of federal law for copyright protection and thus have automatic copyright protection" (*Id.* at 17);
> (4) "This report will show that the alleged actions by defendant are exercises of Ms. Hein's exclusive rights as the copyright owner and therefore would be infringement of her legal rights" (*Id.*);
> (5) "It is my expert opinion that Ms. Hein's works can exceed that standard of creativity" (*Id.* at 22); and
> (6) "Those choices result in the creativity necessary for copyright protection" (*Id.* at 26).

These legal conclusions are supported throughout with a wide-ranging survey and interpretation of the governing law. The court does not doubt Dr. Crews' familiarity with copyright law, but ultimate issues of law are for the judge to instruct on and the jury to decide upon. An expert witness, even a law professor, cannot be a substitute teacher for the court.

The views of other courts confirm this analysis. For example, in *B2A, L.L.C. v. Commlog L.L.C.*, 09-CV-00528, 2011 WL 5569496 at *2 (D. Colo. Nov. 16, 2011), the district court excluded opinions that concluded "Plaintiff's copyrights are 'valid' and that each of the works 'constitutes an original work of authorship and is entitled to copyright protection.'" *See also id.* at *3. In *McNeese v. Access Midstream Partners, L.P.*, CIV-14-503, 2016 WL 9211747 at *3

(W.D. Okla. May 18, 2016), the court excluded opinions that contemplated the "sufficiency of Plaintiff's allegations to support a prima facie case of infringement, as indicated in his report (i.e. the 'fatal errors' contained in the Complaint)[;] such testimony will not be allowed."  In *SA Music v. Apple, Inc.*, 592 F. Supp. 3d 869, 902 (N.D. Cal. 2022), the court excluded "extensive discussion of copyright law" that "hint[ed]" the expert's opinion was "just bald legal conclusions."  "The correct legal framework is for [the court] to determine and instruct the jury."  *Id.*

In support of their argument, Plaintiffs cite an opinion of this court in a patent infringement matter which permitted testimony on the law.  (Doc. 69 at 15-16) (citing *J&M Industries, Inc. v. Raven Industries, Inc.*, 457 F. Supp. 3d 1022 (D. Kan. 2020)).  Plaintiffs argue that the court allowed the expert to testify about ultimate legal issues and argues that their expert should therefore be allowed to do the same.  That case is markedly different than the instant one, but the standard applied regarding expert testimony on ultimate issues is actually the same.  In, In *Raven Industries*, the court declined to exclude certain expert testimony.  Although Plaintiff argues that the expert in *Raven Industries* was allowed to testify on issues of law, a closer reading of this court's opinion indicates that the permissible expert opinions actually went to those "underlying issues of fact." *Id.* at 1051.  Therefore, Plaintiff's citation to *Raven Industries* is not persuasive here.

Other cases cited by Plaintiffs do not change the court's conclusion and rather bolster the line the Tenth Circuit has drawn.  *See United States v. Buchanan*, 787 F.2d 477, 484 (10th Cir. 1986) ("While unadorned legal conclusions are impermissible, courts have allowed the expression of expert opinions on ultimate issues of fact.") (internal citations omitted).  But Dr. Crews' opinion here does not deeply opine on complex ultimate issues of fact, but rather on the very elements required to prove copyright infringement.  (Doc. 69-2 at 11.)  Dr. Crews does not aid the court in understanding a disputed question of fact but instead his report indicates he "states legal

11

conclusions drawn by applying the law to the facts." *United States v. Bedford*, 536 F.3d 1148, 1158 (10th Cir. 2008) (internal citations and quotation marks omitted). "Bare legal conclusion[s] without explaining the criteria [] used to reach that conclusion" will not suffice. *Richter*, 796 F.3d at 1196.

That said, some of Dr. Crews' report is helpful background on the process of obtaining and defending a copyright. At summary judgment, the court will not consider portions of Dr. Crews' report and declaration that reach ultimate legal conclusions, but it will consider Dr. Crews' other information. Additionally, the court will permit Dr. Crews to testify at trial but notes that he will not be allowed to testify on matters relating to ultimate legal issues in the case. Defendant may raise objections at trial to testimony he believes strays into legal conclusions. This balance cautiously tracks the line of Rule 702(a), that expert testimony is primarily intended to "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). The court notes that any expert offered by Defendant will be subject to the same ruling as to ultimate legal issues.

Finally, Defendant contends that Dr. Crews' opinion on "fair use," added through his supplemental declaration, was not timely disclosed. (Doc. 65 at 10-11.) Under Rule 26(a) of the Federal Rules of Civil Procedure ("FRCP"), a failure to disclose discoverable material means a party will be prohibited from using it "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 26 (a). Here, the court finds it unlikely that Defendant was prejudiced by the late disclosure of Dr. Crews' fair use opinion. For the reasons below, the court declines to exclude Dr. Crews' testimony on fair use so long as it does not infringe upon the court's role to instruct on the law and the jury's role to apply it.

12

First, Defendant the only prejudice Defendant asserts is that he did not depose Dr. Crews. (Doc. 65 at 10.)  But, under the factors the Tenth Circuit has instructed courts to consider when evaluating whether a late disclosure is substantially justified or harmless, the court finds the late disclosure is harmless.  *See Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999).[2]  There is little prejudice alleged in Defendant's motion, and no other prejudice is obvious to the court.  The prejudice is largely self-curing as Defendant has been in possession of Dr. Crews' fair use opinion several months before trial and there is no evidence the delayed disclosure will disrupt the trial.  Defendant will have ample opportunity to cross-examine Dr. Crews at trial.  And finally, this situation looks more like unintentional confusion by the parties than a deliberate bad faith effort to withhold an expert opinion.  For those reasons, the court declines to exclude Dr. Crews' opinion on fair use.

## IV.    Summary Judgment Analysis

### A. Standing

"[F]ederal courts have an independent duty to examine the basis of their jurisdiction." *Biziko v. Van Horne*, 981 F.3d 418, 420 (5th Cir. 2020) (internal citation and quotation marks omitted).  Because federal courts are courts of limited jurisdiction, confined by Article III of the United States Constitution and federal law, "parties by consent cannot confer on federal courts subject matter jurisdiction." *United States v. Gulley*, 130 F.4th 1178, 1187 (10th Cir. 2025) (internal citation and quotation marks omitted).  Article III limits access to the federal courts to parties that have "Cases, in Law and Equity, arising under this Constitution, the Laws of the United

---

[2] "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court. A district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose. Nevertheless, the following factors should guide its discretion: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Woodworker's Supply*, 170 F.3d at 993 (internal citations and quotation marks omitted).

States, and Treaties made, or which shall be made, under their Authority" or certain "Controversies."  U.S. Const. art. III, § 2.

For a plaintiff to have a case or controversy of sufficient moment to open the doors to a federal courthouse, she must have the "irreducible constitutional minimum of standing." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992).  That constitutional floor rests upon three pillars; the plaintiff must demonstrate:

> (1) "an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical";
> (2) "a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... the result of the independent action of some third party not before the court";
> (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Id.* at 560-61 (internal quotation marks and citations omitted).  The burden is on Plaintiffs to establish standing.  *Id.* at 561. At summary judgment, a plaintiff must "set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true" that establish standing.  *Id.*

In his summary judgment motion, Defendant contends that Plaintiffs have not pled any injury adequate for standing.  (Doc. 54 at 9-12.)  He claims that Plaintiffs have no intention of generating revenue from Ms. Hein's research or publications and as a result, there is no monetary injury.  (*Id.* at 9-10.)  Defendant also contends that Ms. Hein has suffered no reputational harm from her association with Dr. Mai or Dr. Mai's actions.  (*Id.* at 11.)  By contrast, Plaintiffs counter that regarding their Copyright Act claim, they need not allege actual damages because the statute provides for statutory damages if a violation of copyright is established.  (Doc. 60 at 17-18.)  Plaintiffs next claim that Dr. Mai's listing of Ms. Hein as a "Researcher" or "Contributor" on his website, constitutes reputational harm sufficient to establish standing for their Lanham Act and

common law unfair competition claims.  (Doc. 60 at 19.)  After review, the court finds that Plaintiffs have established standing.

### 1.  The Copyright Act

Statutory violations alone cannot provide a basis for standing.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016) ("Article III standing requires a concrete injury even in the context of a statutory violation. For that reason, Robins could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III.").  The reason for this limitation stems from elementary principles of American self-governance and the separation of powers.  "A regime where Congress could freely authorize *unharmed* plaintiffs to sue defendants who violate federal law not only would violate Article III but also would infringe on the Executive Branch's Article II authority" to enforce the laws. *TransUnion L.L.C. v. Ramirez*, 594 U.S. 413, 429 (2021) (emphasis in original).

Congress may, however, create a new statutory right, the violation of which alongside a concrete harm can provide a sufficient injury to suffice for standing.  *Spokeo*, 578 U.S. at 341-42. The Supreme Court therefore instructs that Plaintiff Hein must show some harm, resulting from the alleged violation of the Copyright Act, to establish standing.  "We cannot treat an injury as concrete for Article III purposes based only on Congress's say-so."  *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 999, n. 2 (11th Cir. 2020) (internal quotation marks omitted).  In *TransUnion*, the Supreme Court provided that a party will have standing when a statutory violation is coupled with a harm "traditionally recognized as providing a basis for a lawsuit in American courts."  594 U.S. at 433.  "An exact duplicate" is not necessary.  *Id.*

Here, the "traditional basis" is relatively evident.  Copyright infringement is "a close historical or common-law analogue" to violations of the Copyright Act.  *New York Times Co. v.*

*Microsoft Corp.*, 777 F. Supp. 3d 283, 310 (S.D.N.Y. 2025) (quoting *TransUnion*, 594 U.S. at 424). After all, "[c]opyright claims predate the Constitution's ratification." *Id.* at 311 (quoting *The Intercept Media, Inc. v. OpenAI, Inc.*, 2025 WL 556019 at *4 (S.D.N.Y. Feb. 20, 2025)). As they are fundamentally "grounded in notions of property rights," claims of copyright infringement "protect against, among other things, the unauthorized reproduction and distribution of protected works." *Id.* at 312. Plaintiff Hein has alleged invasion of her rights to "control [her] creative works." (Doc. 60 at 17.) Defendant has conceded that he reproduced content Ms. Hein published. (Doc. 54 at 5-6.) Accordingly, Plaintiff has standing on her copyright claims.

### 2. *Reputational Harms*

Certain intangible harms are also injuries sufficiently cognizable to provide standing to sue. *TransUnion*, 594 U.S. at 425. The Supreme Court has specifically identified reputational harm as a kind of intangible harm that is cognizable under Article III, as it is "traditionally recognized as providing a basis for lawsuits in American courts." *Id.*; *see also Meese v. Keene*, 481 U.S. 465, 473-77 (1987). But, as explained previously, those harms must be adequately demonstrated. *Lujan,* 504 U.S. at 561. Mere recitations of statutory language or threadbare accusations of harm will not suffice, especially at summary judgment. *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 411-12 (2013) ("[A]t the summary judgment stage, such a party can no longer rest on ... mere allegations, but must set forth by affidavit or other evidence specific facts.") (internal citation and quotation marks omitted).

Here, Ms. Hein complains that Dr. Mai's listing of her name as a "contributor" or "researcher" on his website diminishes the value of her work and harms her reputation. (Doc. 60 at 19.) Ms. Hein also asserts that Dr. Mai has published inaccurate information on his website and that as a consequence she is now associated with a website that is inaccurate. (Doc. 60-8 at 15.)

This she says, causes harm to her academic reputation.  As the Supreme Court explained in *TransUnion*, reputational harms such as these suffice to support standing in Article III courts.  594 U.S. at 425.  As a result, Plaintiffs have standing to pursue their Lanham Act and unfair competition claims.

### B.  Proper Plaintiff

Defendant contends that Plaintiff VGR is not a proper party to this lawsuit and moves to have it dismissed.  (Doc. 54 at 24-27.)  Additionally, Defendant seeks attorney's fees for the portion of the defense of his lawsuit that is attributable to VGR.  (*Id.*)  Plaintiffs contest these notions and assert that VGR has an interest in Plaintiffs' unfair competition claims.  (Doc. 60 at 30.)  The court agrees with Plaintiffs.

Plaintiffs rightly concede that VGR cannot maintain an action for copyright against Dr. Mai because it is not an owner of exclusive right of Ms. Hein's copyrights.  (*Id.*)  Proper plaintiffs in copyright suits must be the copyright owner or the owner of an *exclusive* right. 17 U.S.C. § 501 (a), (b); *Viesti Assoc., Inc. v. Pearson Educ, Inc.*, 2014 WL 1055975 at *3-4 (D. Colo. Mar. 19, 2014).  Indeed, the pretrial order limits Plaintiff VGR to pursuing claims under Count IV, for unfair competition.  (Doc. 59 at 14.)  Plaintiff VGR has not pursued copyright claims.

But VGR is a proper plaintiff in this action because it can, and does, pursue claims under common law unfair competition.  (Doc. 60 at 30.)  The parties dispute whether VGR owns material on the website containing Ms. Hein's research.  (Doc. 54 ay 7-8; Doc. 60 at 10.)  On a motion for summary judgment, the facts must be construed in the light most favorable to the non-moving party.  *Telebank*, 374 F.3d at 927.  Here, that means that the court considers VGR the owner of the materials on the website.  If it is, then it is plausible that VGR has a claim of common law unfair competition.  As a result, Defendant's motion for summary judgment on the issue of VGR as a

proper plaintiff is denied.  The court notes however, that as explained below, Plaintiffs' Lanham Act and unfair competition claims are resolved below in favor of Defendant, and therefore Plaintiff VGR is no longer a party to this lawsuit.

### B.  Copyright Act Statute of Limitations

Defendant argues in its motion for summary judgment that the Copyright Act's three-year statute of limitations has run on Plaintiff's claims for copyright infringement of Ms. Hein's photographs and literary works.  (Doc. 54 at 27-30.)  Defendant contends that he long ago published the allegedly infringing work, (as early as 2017) and Ms. Hein neglected to enforce her rights.  (Doc. 54 at 29.)  Dr. Mai contends that this is the case whether the date of claim's accrual is the date of Ms. Hein's discovery of the violation or the date the violation commenced.  (*Id.*)  Plaintiff denies this assertion and instead argues that under the "discovery rule" for claim accrual, her claims are not barred.  (Doc. 60 at 31.)  Additionally, she posits that Dr. Mai reproduced the infringements multiple times thus restarting the limitations clock.  (*Id.*)  The court agrees with Plaintiff.

In copyright actions, the Tenth Circuit applies the discovery rule.  *Diversey v. Schmidly*, 738 F.3d 1196, 1200 (10th Cir. 2013.)  This rule establishes that "a claim 'for copyright infringement accrues when one has knowledge of a violation or is chargeable with such knowledge.'"  *Id.* (quoting *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994)).  Defendant urges application of another rule, used in other circuits, which holds that the claim accrues when the infringing act occurs.  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 (2014).  The Supreme Court has not passed on the question, and Tenth Circuit law is binding on this court; accordingly, the court applies the discovery rule.  *Id.* at n. 4; *see also Warner Chappell Music, Inc. v. Nealy*, 601 U.S. 366, 371, n. 1 (2024).  Moreover, the court agrees with

Plaintiff, and the Supreme Court, that each subsequent publication of an infringing work constitutes a new "discrete action" that restarts the statute of limitations. *Petrella,* 572 U.S. at 671.

There is, at a minimum, a factual dispute about when Defendant first published and later republished the allegedly infringing work. Plaintiff contends that Dr. Mai republished the work when he recreated his website at each educational institution where he was hired. (Doc. 60 at 32.) The most recent republishing is alleged to have occurred in 2023 when Dr. Mai joined Wichita State University. (Doc. 60 at 32.) This republishing would place Plaintiff's lawsuit within the limitations period. Additionally, under the discovery rule, Plaintiffs maintain that Ms. Hein did not discover the "full scope" of infringing acts until late-2023 which places their lawsuit well within the three-year statute of limitations. (*Id.* at 31.) Defendant disagrees and each side has proffered evidence in support. (Doc. 54 at 29-30; Doc. 60 at 31-32.) As a result, barring Plaintiff's claims at the summary judgment stage would be inappropriate.

### C. Copyright Infringement

Plaintiff Hein has two different claims for copyright infringement. The first concerns the 107 paragraph form compilations of historical genealogical information that Ms. Hein created. (PTO at 13.) The second concerns the eight photographs taken by Ms. Hein. (*Id.* at 12.) Plaintiff alleges Dr. Mai copied both. Dr. Mai only challenges Ms. Hein's assertions of a valid copyright for her compilations. (Doc. 54 at 12.)

To prevail on a claim for copyright infringement a plaintiff must prove: "(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original." *Syrus v. Bennett*, 455 F. App'x. 806, 808 (10th Cir. 2011) (quoting *Feist Publ'ns Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991)) (internal quotation marks omitted). Defendant contends that Ms. Hein does not have a valid copyright because her work is unoriginal and also contends that he

did not copy any "original" portions of Ms. Hein's work and therefore cannot be liable for infringement. (Doc. 54 at 12, 17.)  For the reasons below it is the court's view that no genuine question of material fact remains for trial, and therefore Defendant's claim for summary judgment on the copyright of compilations is granted.  Defendant makes no arguments regarding the validity of the copyright claims for the photographs, so the court does not address them here.

Turning to the first element, the court considers whether Plaintiff has ownership of a valid copyright.  Defendant argues that she does not because her copyright is composed of facts, which may not be copyrighted.  *Feist*, 499 U.S. at 344.  Facts independently exist and are therefore not created by a copyright holder.  *Id.* at 347.  Because they lack creativity, attempts to enforce a copyright of facts or ideas should be rejected by federal courts.  *Id.*  This is because, as the Supreme Court has explained, the purpose of a copyright is not just to reward the toil of individuals but instead to "promote the Progress of Science and useful Arts."  U.S. Const. art. I, § 8, cl. 8; *accord Feist*, 499 U.S. at 349.

That infallible dogma aside, compilations of facts may be copyrighted.  *Feist*, 499 U.S. at 345.  But still, the facts within those compilations are not protected.  *Id.* at 349.  What is protected is the mode of expression.  *Id.* at 348-49.  Yet not every expression of facts or ideas will meet the irreducible constitutional minimum of originality.  *Id.* at 345-46.  The Supreme Court in *Feist* laid the intellectual groundwork for determining whether a compilation possessed the minimum "creative spark" to demonstrate originality.  *Id.* at 359.

In *Feist*, the issue concerned a public utility in Kansas that was required to periodically issue updated telephone directories.  499 U.S. at 342.  Feist was a publishing company that produced area-wide telephone directories covering a geographic area much wider than that of the utility.  *Id.* at 343.  After failing to secure the public utility's permission to use its directory listing,

Feist copied them anyway. *Id.* The public utility sued alleging copyright infringement. *Id.* The Supreme Court rejected the public utility's claims to copyright for its "garden-variety white pages directory" that was "devoid of even the slightest trace of creativity." *Id.* at 362.

The court's north star here is the Supreme Court's admonition that "the selection and arrangement of facts cannot be so mechanical or routine as to require no creativity whatsoever." *Id.* at 362. In this case, as in *Feist*, Plaintiffs concede that the compilations created by Ms. Hein are made up of "individual pieces of biographical data" that are not independently copyrightable. (Doc. 60 at 5.) The question before the court is whether Ms. Hein's compilations of these "individual pieces of biographical data" (*id*), possess enough "intellectual production, of thought, and conception" to clear the "low" standard of originality. *Feist*, 499 U.S. at 362.

Defendant alleges that Ms. Hein's compilations are devoid of the "modicum of creativity" necessary to possess a valid copyright. *Id.* Here, there would be a fact issue for trial that remains on the issue of a valid copyright concerning the compilations. Ms. Hein has presented evidence that explains she uses "careful selection, translation, verification, arrangement, compilation, and narrative construction" of her research. (Doc. 60-1 at 1.) Dr. Mai, at least in part, concedes this point in his deposition. (Doc. 60-9 at 52-53.) Whether this activity, and the evidence thereof, suffices to convince a jury that Ms. Hein's work contains enough originality to merit copyright protection is an open question for trial. But this deferral to the factfinder only gets Plaintiffs over the first prong of the copyright infringement analysis.

The second prong of copyright infringement requires "copying of constituent elements of the work that are original." *Syrus*, 455 F. App'x. at 808. "Although substantial similarity is often a fact issue for jury resolution, a court may 'determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only

non-copyrightable elements of plaintiff's work or because no reasonable jury, properly instructed could find the two works are substantially similar.'" *Churchill Livingstone, Inc. v. Williams & Wilkins, a Div. of Waverly, Inc.*, 949 F. Supp. 1045, 1049-50 (S.D.N.Y. 1996) (quoting *Warner Bros. Inc. v. American Broadcasting Cos.*, 720 F.2d 231, 239-40 (2d Cir. 1983)).   Defendant asserts that he did not copy any copyrightable portions of Ms. Hein's work.  (Doc. 54 at 15.)  He goes so far to excerpt portions of Ms. Hein's website in his brief and compare it with his own website entries.  (*Id.* at 16-18.)  Defendant then strips each entry of the purported facts that are not copyrightable, and what remains is a mere "skeleton."  (*Id.*)  Defendant's argument is akin to the "abstraction-filtration-comparison" test that the Tenth Circuit, and others, have adopted to review copyright cases involving the "thin" protection for compilations of facts.  *TransWestern Pub. Co LP v. Multimedia Marketing Assoc.*, 133 F.3d 773, 777 (10th Cir. 1998).  "That test requires filtering out nonprotectible ideas and components and then comparing protectible elements in the plaintiff's work with the defendant's allegedly infringing product."  *Id.*  The Tenth Circuit has instructed that this test is not appropriate in all cases, but this case is squarely within its reach.  *See Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1372-73 (10th Cir. 1997) ("[W]e emphasize that the approach is valuable only insofar as it aids the court in distinguishing protectable elements of a work from those that are unprotectable.").

To apply the abstraction-filtration-comparison test, the court must:

(1) "dissect the [copyrighted work] according to its varying levels of generality";
(2) "examine each level of abstraction in order to filter out those elements of the [copyrighted work] which are unprotectable";
(3) "compare the remaining protectable elements with the allegedly infringing [work] to determine whether the defendants have misappropriated substantial elements of the plaintiff's [work]."

*Gates Rubber Co. v. Bando Chem. Indus.*, 9 F.3d 823, 834 (10th Cir. 1993).  To conduct the dissection, the court must "filter out ideas and processes from protectable expression."  *Id.*  For

complicated technologies or computer code, this task can be particularly arduous, *id.*, but in this case the task is relatively simple.  Here, the court refers back to the example explained in the facts section, that concerned the surname "Hessler" and again reproduces the text from Ms. Hein's registration below:

> Johann Jacob Hessler (son of Johann Jacob Hessler of Niedergründau) was baptized on 15 December 1718.  Anna Maria Meininger (daughter of Johannes Meininger of Mittelgründau) was baptized on 2 December 1725. Johann Jacob and Anna Maria married in Rothenbergen on 26 August 1745.
>
> Baptisms were recorded for the following children, all born in Rothenbergen: Johann Conrad, born 5 February and baptized 12 February 1747 (died 30 April 1754); twin daughters born 28 May and baptized 29 May 1751, Anna Margaretha (died 16 May 1754) and Christina; Anna Margaretha born 22 May and baptized 25 May 1755; Elisabetha, born 24 January and baptized 26 January 1760 (died 27 Jan 1760); and twin sons born 5 February and baptized 7 Feb 1762, Valentin (died 5 Mar 1764) and Friedrich.
>
> Jacob Hessler died on 8 Nov 1762. On 5 Jan 1764, Anna Maria Hessler (widow of Jacob Hessler) married Hartmann Ifland (son of Johannes Ifland from Lützelhausen) in Rothenbergen. They had a daughter Catharina, born 2 January and baptized 8 January 1765.
>
> Hartmann, Anna Maria, and three of the Hessler children (Christina, Anna Margaretha, and Friedrich) arrived in Russia on 9 August 1766.  Hartmann apparently died during the journey to the villages.

(Doc. 60-4 at 20.)  As one can see, this passage is composed almost entirely of facts (names, dates, and locations) that are not subject to copyright protection.  The court "dissects" the passage below by removing the names, dates, and locations that Ms. Hein must have acquired from her research and leaving the remaining material:

> _____  (son  of  _____ of  _____)  was  baptized  on _____.  _____ (daughter of _____ of _____) was baptized   on   _____.   _____and   _____married   in _____on _____.
>
> Baptisms  were  recorded  for  the  following  children,  all  born  in  _____: _____,  born  _____  and  baptized  _____  (died _____); twin  daughters  born  _____  and  baptized  _____, _____  (died  _____)  and  _____;  _____born

_____ and baptized _____; _____, born _____ and baptized _____ (died _____); and twin sons born _____ and baptized _____, _____ (died _____) and _____.

_____ died on _____. On _____, _____ (widow of _____) married _____ (son of _____ from _____) in _____. They had a daughter _____, born _____ and baptized _____.

_____, _____, and three of the _____ children (_____, _____, and _____) arrived in _____ on _____. _____ apparently died during the journey to the villages.

As the skeletal remains of Ms. Hein's work demonstrate, there is very little independently copyrightable material in this passage. The final step of the analysis is to compare this skeleton with Dr. Mai's alleged copy. The court reproduces Dr. Mai's passage below:

> Johann Jacob Hessler, son of Johann Jacob Hessler of Niedergründau, was baptized on 15 December 1718. Anna Maria Meininger, daughter of Johannes Meininger of Mittelgründau, was baptized on 2 December 1725, Johann Jacob and Anna Maria were married Rothenbergen on 26, August 1745.
>
> The Gründau parish register records the baptisms of the following children of Johann Jacob & Anna Maria Hessler, each born in Rothenbergen: (1) Johann Conrad, born 5 February 1747, baptized 12 February 1747, died 30 April 1754; (2 & 3) twins Anna Margaretha (who died 16 May 1754) & Christina, born 28 May 1751, baptized 29 May 1751; (4) Anna Margaretha, born 22 May 1755, baptized 25 May 1755; (5) Elisabetha, born 24 January 1760, baptized 26 January 1760, died 27 January 1760; and (6 & 7) twins Valentin (who died 5 March 1764) & Friedrich, born 5 February 1762, baptized 7 February 1762.
>
> Johann Jacob Hessler died 8 November 1762, and his widow remarried on 5 January 1764 to Hartmann Ifland. They had a daughter Catharina, born 2 January 1765 and baptized 8 January 1765.
>
> The Ifland family, along with 3 of the Hessler children, arrived from Lübeck at the port of Oranienbaum on 9 August 1766 aboard the pink *Slon* under the command of Lieutenant Sergey Panov.

(Doc. 60-4 at 20.) While Mai's reproduction certainly contains the same basic information as Ms. Hein's skeleton above, it can hardly be said to be a copy of copyrightable content. Basic sentences, which at least in this example Mai does not copy verbatim, and words like "baptism" or "born"

24

which appear throughout, do not possess the "creative spark" required to demonstrate copyright protection. *Feist*, 499 U.S. at 345; *see also CMM Cable Rep, Inc. v. Ocean Coast Prop., Inc.*, 97 F.3d 1504, 1519 (1st Cir. 1996) ("It is axiomatic that copyright law denies protection to 'fragmentary words and phrases' and to 'forms of expression dictated solely at functional considerations' on the grounds that these materials do not exhibit the minimal level of creativity necessary to warrant copyright protection.") (quoting 1 Nimmer, 2.01[B], at 2-13-18).

That moves the court from the abstraction-filtration-comparison test to the question of whether Ms. Hein's *mode of presentation* itself was infringed. *Feist*, 499 U.S. at 349. The answer to this question must also be no. Because Ms. Hein chooses the humble paragraph format to present her information, she argues that Dr. Mai should not have been able to do so. (Doc. 60 at 22.) But this argument proves too much. Copyright law cannot grant the first researcher who discovered and published a compilation of facts with little additional synthesis a monopoly over the mode of presentation of that information. A holding affirming such a principle would flout the very premise of Congress's Article I power and the Supreme Court's warnings in *Feist* and thereafter. *Feist*, 499 U.S. at 350; *see also MDM Group Assoc. v. Resortquest Int'l, Inc.*, No. 06-CV-1518, 2009 WL 2924821 at *14 (D. Colo. Sep. 9, 2009) ("This shared purpose necessitates similar expression because there are a limited number of ways to convey the basic operation of the damage waiver."). "A Court may find non-infringement as a matter of law where the similarity between the works concerns only non-copyrightable elements of the plaintiff's work or no reasonable jury could find the two works to be substantially similar." *Madrid v. Chronicle Books*, 209 F. Supp. 2d 1227, 1239 (D. Wyo. 2002).

While the above is merely one example, the court has reviewed additional examples submitted by Plaintiff with her expert testimony briefing. (Doc. 69-4 at 9-38.) The court finds

that they are substantially similar such that summary judgment for Defendant is appropriate on all of Plaintiff's compilation copyright claims. (*Id.*) Additionally, Plaintiff does not contend in her facts nor argue that the character of any of her compilation claims are different than described above. Accordingly, the court grants Defendant's motion for summary judgment on the compilation claims.

### D. Fair Use

Not every use of a copyrighted work is unlawful. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 574-75 (1994). The Copyright Act provides for a defense of "Fair Use", which permits certain uses of copyrighted works by unlicensed entities subject to certain limitations. 17 U.S.C. § 107. Initially, it is important to note that Plaintiff believes Defendant's motion for summary judgment was only arguing fair use regarding the factual compilations. (Doc. 60 at 24.) The court does not share this view. Moreover, because Defendant prevailed on his motion for summary judgment on the compilation issue discussed above, the fair use defense could only be applied to Defendant's use of the photographs. The court holds that Defendant's use of the photographs is not protected by fair use.

The Copyright Act sets forth factors for the federal courts to consider when evaluating the fair use defense. 17 U.S.C. § 107. The factors reproduced below however, require significant "judicial balancing", *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 527 (2023):

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  The court will consider these factors in turn, keeping in mind the Supreme Court's reminder that "fair use is a flexible concept" because its "principles apply across a wide range of copyrightable material, from books to photographs to software."  *Goldsmith*, 598 U.S. at 527.  The application of fair use "may well vary depending on context."  *Id.*  The statute provides some help, as it suggests certain fair uses like "criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research."  17 U.S.C. § 107.

### 1.  *Purpose and Character of the Use*

The purpose-and-character-of-the-use factor "considers the reasons for, and nature of, the copier's use of an original work."  *Goldsmith*, 598 U.S. at 528.  "The central question it asks is whether the new work merely supersedes the objects' of the original creation … (supplanting the original), or instead adds something new, with a further purpose or different character."  *Id.* (internal citations and quotation marks omitted).

Defendant primarily argues on this point that Ms. Hein's works are not "for commercial purposes."  (Doc. 54 at 18.)  But this misunderstands the nature of the prong.  The first prong inquires into the nature of the *alleged infringer's* use.  *See* 17 U.S.C. § 107 (1).  To this, Defendant only devotes a paragraph.  (Doc. 54 at 19.)  While the court agrees that Dr. Mai's use is on its face non-commercial, there is at least a question of fact as to whether the photographs contribute to Dr. Mai's other sources of income, such as his tours or translations.  (Doc. 60 at 24-25.)  Defendant's bald assertion that "not-for-profit, non-commercial use is presumptively fair" is not nearly enough to overcome this notion.  (Doc. 54 at 19.)

### 2.  *Nature of the Copyrighted Work*

The court next considers the nature of the copyrighted work.  Defendant only argues about the compilations for this portion of this fair use test.  (*Id.*)  But ultimately, at this prong "the more

creative a work, the more protection it should be accorded from copying." *Hill v. Pub. Advoc. of the United States*, 35 F. Supp. 3d 1347, 1359 (D. Colo. 2014) (quoting 4 Nimmer on Copyright § 1305). Here, photographs are undoubtedly creative and routinely receive copyright protection. *See* 17 U.S.C. § 106A; *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1116-19 (9th Cir. 2018). Therefore, this prong cuts against finding fair use.

### 3. Amount and Substantiality

The third factor asks how much of the copyrighted work did the infringer use relative to the whole of copyrighted work. 17 U.S.C. § 107 (3). Here, Defendant again misapplies the standard and compares the amount of copying to the amount of material on his website. (Doc. 60 at 20.) But the standard is what portion of the *copyrighted work* did Defendant infringe. *Acuff-Rose Music*, 510 U.S. at 586. Here, Defendant admits to using eight separate photos that were copyrighted by Plaintiff Hein. (Doc. 66 at 6.) This amounts to Defendant using 100% of the copyrighted work which cuts against a finding of fair use. *Viper Nürburgring Record L.L.C. v. Robbins Motor Co., L.L.C.*, No. 18-CV-04025, 2019 WL 4256372 at *9 (D. Kan. Sep. 9, 2019) (citing 4 Nimmer on Copyright § 13.05 [A][3]).

### 4. Effect on Market Value

The Supreme Court has opined that the "[f]air use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." *Harper & Row Pub., Inc. v. Nation Enter.*, 471 U.S. 539, 562 (1985) (quoting 1 Nimmer § 1.10[D] at 1-87) (internal quotation marks omitted). "[T]o negate fair use one need only show that if the challenged use 'should become widespread, it would adversely affect the *potential* market for the copyrighted work.'" *Id.* at 568 (quoting *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984) (emphasis in original)).

Defendant argues that because Ms. Hein's work is not for sale, there is no effect on the market value. Here, there are no factual disputes to resolve. Ms. Hein admitted in her deposition that she does not monetize any aspect of her website. (Doc. 54-43 at 5-6.) Therefore, there can be no effect on the market. Dr. Mai's possible monetization of his website through tours and translations does not change this conclusion. Dr. Mai is not preventing Ms. Hein from engaging in the same market; she simply states no intention to do so. Dr. Mai's use of the photographs does not diminish the market value of Ms. Hein's activities, because the market value is, by Plaintiff's choice, zero. Plaintiff claims that Dr. Mai's use "effectively destroyed or diminished the independent value of her website, her research, and her reputation to persons seeking information on Volga German[s]" is without citation or support. (Doc. 60 at 26.) Ms. Hein's reputation is not the subject of fair use, her work product is.

Despite finding that there is no effect on the present market value, the fair market value could at some future date be affected should Ms. Hein ever decide to monetize her work. *Harper & Row Pub., Inc.*, 471 U.S. at 568 ("More important, to negate fair use one need only show that if the challenged use 'should become widespread, it would adversely affect the *potential* market for the copyrighted work.'") (quoting *Sony Corp*. 464 U.S. at 451) (emphasis in original). In a way then, Dr. Mai's arguments on the market value prong are largely pyrrhic victories. The court finds that the factors weigh against Defendant and therefore Dr. Mai's infringing use of the photographs cannot be protected by fair use. Considering the foregoing, Defendant's motion for summary judgment on fair use grounds is denied.

### E.  Statutory Damages and Attorney's Fees for Copyright Infringement

Defendant contends that Plaintiff is not entitled to statutory damages or attorney's fees for infringement of her copyrighted photographs. (Doc. 54 at 30.) Plaintiff avers however, that she

is not pursuing statutory damages on these claims.  (Doc. 60 at 33); *see also* (Doc. 59 at 16-17.)  Consequently, the court denies Defendant's motion for summary judgment on this statutory damages issue as moot.

Regarding attorney's fees, Plaintiff argues she is entitled to attorney's fees if she prevails on her damages and equitable relief claims.  (Doc. 60 at 33.)  Defendant argues that the Copyright Act at 17 U.S.C. § 412 bars recovery of attorney's fees because her copyright registration was made more than three months after the initial publication of the photograph.  (Doc. 54 at 30.)  Plaintiff does not produce an argument refuting this notion and merely cites to the damages provision of the Copyright Act at 17 U.S.C. § 505.  But the reach of § 505 is expressly limited by § 412.

Defendant has declared in a sworn affidavit that he placed the eight photographs on his website prior to November 25, 2020.  (Doc. 54-2 at 4.)  The date of Ms. Hein's copyright registrations is December 3, 2023.  (PTO at 3-4.)  This would seem to trigger the § 412 restriction on recovery of attorney's fees as publication predated registration by more than three months.  Plaintiff has not pointed the court to contrary evidence about the publication date of Ms. Hein's photographs.  *See* (Doc. 60 at 33.)  After reviewing the evidence proffered by Defendant, the court sees no genuine dispute of material fact and therefore grants the motion for summary judgment on the attorney's fees issue.

The court does not consider Defendant's argument, raised for the first time in his reply brief, that Plaintiff Hein has failed to prove unjust enrichment damages.  (Doc. 66 at 20-23.)

### F.  Lanham Act & Unfair Competition

Plaintiffs also raise claims under Kansas common law unfair competition and under Section 43(a) of the federal Lanham Act.  The parties agree that a Kansas unfair competition law

claim is identical to a claim under Section 43(a).  (Doc. 54 at 21; Doc. 60 at 30.)  The court also agrees with this conclusion and therefore merges the analysis.  *Triple-I Corp. v. Hudson Assoc. Consult., Inc.*, 713 F.Supp.2d 1267, 1286 (D. Kan. 2010).  As expressed at 15 U.S.C. § 1125, Section 43 (a) of the Lanham Act states:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125 (a).  Subsection (1)(A) is referred to as the "false association" portion of Section 43, *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014), and that is what Plaintiffs bring their claims under here.  *See* (PTO at 13-14.)  There is no indication that Plaintiffs assert claims under subsection (1)(B) which is the "false advertising portion of Section 43(a)." *Lexmark*, 572 U.S. at 122.  To "prevail in an action for unfair competition under § 43(a) [of the Lanham Act], a plaintiff must establish that (1) her mark is protectable, and (2) the defendant's use of [an identical or similar] mark is likely to cause confusion among consumers." *Triple-I Corp.*, 713 F. Supp. 2d at 1285 (internal quotation marks omitted) (quoting *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1215 (10th Cir. 2004)).

Plaintiffs argue that Defendant's use of Ms. Hein's name, with the title "researcher" or "contributor" placed next to it, diminishes her stature in her research field and falsely indicates she

has a professional association with Dr. Mai.  (Doc. 60 at 27-30.)  Defendant does not contest the factual assertion by Plaintiffs that Dr. Mai lists Ms. Hein's name on his website as "researcher" or "contributor."  (Doc. 54-2 at 3.)  Rather, Defendant makes two arguments about why Plaintiffs' Lanham Act claims must fail as a matter of law.  First, he argues that the Lanham Act only protects so-called "commercial use[s]", of which Plaintiffs' is not.  (Doc. 54 at 21-24.)  Second, Defendant argues that Plaintiffs seek to "embed" a required citation format into federal law, by highlighting Plaintiffs' apparently conflicting complaints that Dr. Mai does not give Ms. Hein credit but also diminishes her when he cites her.  (*Id.* at 21.)  The court grants Dr. Mai's motion for summary judgment on the Lanham Act and Kansas unfair competition claims because the use of Ms. Hein's name is not commercial.

The court finds that Plaintiffs mostly concede that the Lanham Act requires commerciality, (Doc. 60 at 29), they simply contend that the websites are in commerce.  The court's survey of Lanham Act case law confirms a commerciality requirement. *See Lexmark*, 572 U.S. at 131-32 (holding commercial interests are required to sue under the false advertising prong); *Stanfield v. Osborne Industries, Inc.*, 52 F.3d 867, 873 (10th Cir. 1995) (same but as applied to false association).  Plaintiffs have alleged that the use of their name has enabled Dr. Mai to receive income from selling tours and translations on a different page of his website.  (Doc. 60 at 29.) Plaintiffs also imply that simply because both websites are on the internet, that is sufficient to put them in commerce.  (*Id.* at 27.)

But this is not enough.  The Tenth Circuit considered a nearly identical situation in the case *Utah Lighthouse Ministry v. Foundation for Apologetic Information and Research*, 527 F.3d 1045 (10th Cir. 2008).  In that case, the defendant had copied the logo of a website that produced information criticizing the Mormon Church.  *Id.* at 1049.  The defendant was a pro-Mormon

foundation that published responses to these criticisms. *Id.* The plaintiff alleged that the copying of their logo was, among other things, a violation of Section 43(a) of the Lanham Act. *Id.* They contended that the use was commercial because the infringing website contained a link to the defendant's other website which contained a bookstore. *Id.* at 1052. The court held that "the 'roundabout path' to the advertising or commercial use of others is simply 'too attenuated.'" *Id.* at 1053 (quoting *Bosley Med. Inst. v. Kremer*, 403 F.3d 672, 679 (9th Cir. 2005)). The plaintiff in that case also argued that merely being on the internet was sufficient to make a website commercial. *Id.* at 1052. The *Utah Lighthouse* court rejected that argument as well. *Id.* at 1054. As in *Utah Lighthouse*, here, Dr. Mai's website "is overwhelmingly noncommercial in nature," despite its link to another website with information about Dr. Mai's tours. *Id.* at 1053.

Plaintiffs' other arguments resisting this conclusion are unavailing as they highlight even more attenuated commerciality such as their "paying for a URL and copyright registrations, having a bank account, and spending substantial sums on hard copy research materials, subscription websites, technical support for a website, and travel for research and to attend conferences." (Doc. 60 at 29.) None of this evidence places Dr. Mai's website in commerce, which is the ultimate question. As a consequence, the court grants Defendant's motion for summary judgment on the Lanham Act and unfair competition claims.

## V.    Conclusion

After analysis, the single remaining issue left for trial is Defendant's liability for copyright infringement of Plaintiffs' photographs. (PTO at 12.) For the foregoing reasons Defendant's motion for summary judgment (Doc. 53) is GRANTED IN PART and DENIED IN PART. Additionally, Defendant's motion to exclude expert testimony (Doc. 65) is GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED.  Dated this 7th day of January, 2026.

s/ John W. Broomes
JOHN W. BROOMES
CHIEF UNITED STATES DISTRICT JUDGE